[Docket No. 1]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| ANTHONY A. SIRAVO, JR., | |
| Plaintiff, | Civil No. 15-2836 (RMB) |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

APPEARANCES:

Anthony A. Siravo, Jr.
     <u>Pro Se</u> Plaintiff

Antonia Maria Pfeffer, Esq.
Social Security Administration
Office of the General Counsel
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
     Attorney for Defendant Commissioner of Social Security

**BUMB,** UNITED STATES DISTRICT JUDGE:

     This matter comes before the Court upon the appeal by

<u>pro se</u> Plaintiff Anthony A. Siravo, Jr. (the "Plaintiff") of the

final determination of the Commissioner of Social Security (the

"Commissioner") denying Plaintiff's application for social

security benefits for the period January 10, 2012 through

October 22, 2012 [Docket No. 1].  For the reasons set forth

below, the Court **AFFIRMS** the decision of the Administrative Law

Judge (the "ALJ").

## I.  STANDARD OF REVIEW

A reviewing court must uphold the Commissioner's factual findings if they are supported by "substantial evidence," even if the court "would have decided the inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); see also 42 U.S.C. §§ 405(g), 1383(c)(3).  "'Substantial evidence' has been defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Dellapolla v. Comm'r of Soc. Sec., 662 F. App'x 158, 160 (3d Cir. 2016) (quoting Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971))).  Where the evidence is susceptible to "more than one rational interpretation, the Commissioner's conclusion must be upheld."  Ahearn v. Comm'r of Soc. Sec., 165 F. App'x 212, 215 (3d Cir. 2006) (citing Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986)); see also New Jersey Bd. of Pub. Utilities v. F.E.R.C., 744 F.3d 74, 94 (3d Cir. 2014).

In addition to the "substantial evidence" inquiry, the reviewing court must also determine whether the ALJ applied the correct legal standards.  See Mitton v. Comm'r of Soc. Sec., --- F. App'x ----, 2016 WL 6933937, at *1 (3d Cir. Nov. 28, 2016); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).  The Court's review of legal issues is plenary.  Mitton, 2016 WL

6933937, at *1 (citing <u>Hagans v. Comm'r of Soc. Sec.</u>, 694 F.3d 287, 292 (3d Cir. 2012)); <u>Sykes</u>, 228 F.3d at 262 (citing <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999)).

### "Disability" Defined

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Act further states that:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The Third Circuit has described the Commissioner's inquiry at each step of this analysis, as follows:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that his impairments are "severe," he is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to his past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume his former occupation, the evaluation moves to the final step.

At this [fifth] stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The Court recites only the facts that are necessary to its determination on appeal.

### A. Medical History

On June 15, 2010, Plaintiff underwent an MRI of his right shoulder.  Dr. Allan Cummings, a board certified radiologist, observed "a nearly complete tear of the distal supraspinatus just proximal to its insertion onto the greater tuberosity, a significant worsening in its appearance when compared to the previous study of 4/07.  The remainder of the rotator cuff appears intact."  R. 372.

On March 25, 2011, Plaintiff was examined by Dr. Matthew Pepe.  Dr. Pepe noted that "Examination of his shoulder demonstrates full motion.  Tenderness over the biceps and tuberosity.  Positive impingement signs.  Negative biceps maneuvers.  Negative SLAP maneuvers.  Skin is intact.  Motor and sensory examination is intact."  Dr. Pepe reviewed an MRI of Plaintiff's shoulder, which "demonstrate[d] a full-thickness 1 cm anterior supraspinatus tear, no retraction, no atrophy, type II acromion, and AC arthropathy."  Dr. Pepe diagnosed Plaintiff with a right shoulder chronic full-thickness rotator cuff tear and administered a platelet rich plasma injection.  He noted that Plaintiff "tolerated the injection well" and "will

rest for one week and begin a gentle stretching and strengthening program." R. 358.

Plaintiff underwent an MRI of his right shoulder on July 13, 2011. Dr. Cummings observed "a small, partial tear of the distal supraspinatus," which "represents a substantial improvement when compared to the previous exam, where the distal supraspinatus was nearly completely torn." Dr. Cummings also noted "a probable small loose body in the posterosuperior aspect of the glenohumeral space, which was not seen on the prior study." R. 360.

On August 19, 2011, Daniel J. Colache, Plaintiff's chiropractor, completed an Examination Report. He noted that Plaintiff was diagnosed with a rotator cuff tear with shoulder instability on right, with an onset date of 2008. R. 373.

Dr. David Lunt also completed an Examination Report on December 19, 2011. He noted that Plaintiff's primary diagnosis is right shoulder torn rotator cuff. He also wrote: "disabled". R. 374-75.

On or around March 1, 2012, Mr. Colache, in response to a request for medical records regarding Plaintiff, wrote to the Social Security claims adjudicator: "I have not treated in over a year sorry cannot fill out paperwork." R. 376.

On April 4, 2012, Dr. Mark Jacknin, a State agency medical consultant, reviewed Plaintiff's medical records and noted that

Plaintiff's June 15, 2010 MRI showed a nearly complete tear of the distal supraspinatus.  The July 2011 MRI, however, demonstrated "substantial improvement of the appearance of the supraspinatus since prior study, w a small partial tear seen distally in ant. supraspinatus @ current time as opposed to the nearly complete tear of the distal supraspinatus noted prev."  Dr. Jacknin also observed "a probable small loose body in the posteriosuperior aspect of glenohum space, which wasn't seen on prior study."  R. 127.

On April 17, 2012, Plaintiff underwent an MRI of his right shoulder.  Dr. Cummings observed "once again . . . a small tear involving the distal supraspinatus, stable since the previous exam."  Dr. Cummings reported that "there is little overall change since the prior study of 7/11 with a small tear of the distal supraspinatus noted and unchanged between studies."  He did not see the loose body noted in the July 2011 MRI and noted that it "has resolved or been removed between studies."  R. 377.

On June 11, 2012, Dr. Jacknin also reviewed Plaintiff's April 17, 2012 MRI and observed "little overall changes since prior study of 7/11 w a small tear of the distal supraspinatus noted & unchanged between studies."  He also noted that "current MRI shoulder showing improvement including tear is 'small' and prior small loose body has resolved."  R. 131.

Dr. Lunt completed a second Examination Report on June 19, 2012, in which he indicated that the date of onset of Plaintiff's right shoulder torn rotator cuff was 2010.  R. 383. He opined that Plaintiff is "unable to work."  Dr. Lunt also noted that "MRI shows significant damage to right rotator cuff indicating a nearly complete tear of the distal supraspinatus. With his current insurance it's extremely difficult to obtain the needed surgical repairs."  R. 384.

On March 10, 2014, Plaintiff was examined by Dr. Lunt for reevaluation of his rotator cuff tear.  The following week, on March 17, 2014, Plaintiff underwent an MRI of his right shoulder, which Dr. Lunt opined showed "a superimposed full thickened tear of the distal supraspinatus measuring 2.8 x 2.5 cm."  Dr. Lunt also noted that "the groove for the long head biceps tendon is shallow and the tendon is very poorly seen which is consistent with a history of chronic biceps tear." R. 12.  Dr. Michael Dutka, a radiologist, also examined the March 2014 MRI and noted moderate rotator cuff tendonosis and bursitis, superimposed full-thickness distal supraspinatus tear measuring 2.8 x 2.5 cm, and mild-to-moderate AC osteoarthritis with spurring and subacromial spur.  Dr. Dutka also opined that the "supraspinatus tear has enlarged" in comparison to previous reports.  R. 13-15.

On May 27, 2014, Dr. Pepe submitted a letter "as an appeal of [Plaintiff's] disability decision." Dr. Pepe explained that the platelet rich plasma injection into the rotator cuff tear "was intended as a stopgap measure to help stabilize the rotator cuff tear and prevent further progression." He noted that Plaintiff's July 2011 MRI showed improvement of the tear, but explained that a March 2014 MRI demonstrated that the tear had worsened into a "large tear, which necessitates repair." R. 10.

## B. Function Report

On February 29, 2012, Plaintiff completed a Function Report regarding his activities of daily living. He noted that he suffers from pain, inflammation, throbbing, and burning that affect his sleep. R. 305. He also reported that he is able to do light household chores and cooking, but that he must use his non-dominant side due to his right shoulder injury. R. 306. Plaintiff indicated that his condition affects his ability to lift. R. 308. Plaintiff also reported that he wears an arm sling once in a while when his arm becomes fatigued or his pain starts. When asked if the sling was prescribed by a doctor, Plaintiff noted "only by suggestion." R. 310. Plaintiff explained that he "was instructed to do a rehab program such as light stretching with bands, or weights to keep the joints from freezing up or clotting. Reference doctor's report. This would be pre surgery + post." R. 311.

### C. Consultative Examination

Plaintiff underwent a consultative examination with Dr. Ronald Bagner on May 22, 2012.  Plaintiff reported pain in his right shoulder which disrupts his sleep and that he cannot do any pushing, pulling, or lifting.  Dr. Bagner observed that Plaintiff "ambulates without difficulty, gets on and off the examining table without difficulty, dressed and undressed without assistance."  He also noted that "there is pain on movement of the right shoulder" and that "the right shoulder shows 0-90 degrees forward elevation, 0-90 degrees abduction, internal rotation is 0-50 degrees, and normal external rotation."  Dr. Bagner's impression was "tear distal right supraspinatus."  R. 379.

### D. Application for Social Security Benefits

On or about January 10, 2012, Plaintiff filed applications for Social Security disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging an onset date of January 10, 2012.  R. 256-71.  The claims were denied initially on or about June 27, 2012.  R. 123-33.  On October 23, 2012, upon reconsideration, the Social Security Administration found that Plaintiff was disabled as of October 23, 2012, but not as of his alleged onset date.  R. 165-73.  Thereafter, on March 20, 2013, Plaintiff requested a hearing before an ALJ.  R. 225-26.

On December 3, 2013, ALJ Jonathan L. Wesner held a hearing, at which Plaintiff appeared without an attorney, and provided testimony.  Plaintiff's friend Ilene also attended and interacted with the ALJ.  Additionally, William T. Slaven, III, an impartial vocational expert, provided testimony.  R. 47-102. Mr. Slaven testified that, due to Plaintiff's overhead reaching limitations, he would be limited to a partial range of light work.  R. 93.  Additionally, he testified that Plaintiff could perform 60-70% of jobs in the light range and that, even if Plaintiff completely avoided overhead reaching, Plaintiff could still perform "300, 400 of the 1,600 light titles Social Security recognizes."  R. 93.  Thereafter, on February 25, 2014, the ALJ issued an unfavorable decision.  R. 34-41.  On February 18, 2015, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final determination of the Commissioner.  R. 1-5.

### III.   THE ALJ'S DETERMINATION

On February 25, 2014, the ALJ concluded that Plaintiff was not disabled under the Social Security Act from his alleged onset date, January 10, 2012, through October 22, 2012, the day before he was found disabled by the Social Security Administration on reconsideration.  R. 31-41.

At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset

date of January 10, 2012.  R. 36.  At Step Two, the ALJ determined that Plaintiff suffered from the following severe impairment: right shoulder rotator cuff tear.  R. 36.  At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In making this determination, the ALJ specifically reviewed Listing 1.02.  R. 37–38.

Before turning to Step Four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC").  The ALJ determined that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except overhead reaching with the right upper extremity is limited to occasionally."  R. 38.

The ALJ did not make a determination at Step Four and instead proceeded directly to Step Five, utilizing the expedited process outlined in 20 C.F.R. § 404.1520(h), which states, in relevant part:

> If we do not find you disabled at the third step, and we do not have sufficient evidence about your past relevant work to make a finding at the fourth step, we may proceed to the fifth step of the sequential evaluation process. If we find that you can adjust to other work based solely on your age, education, and the same residual functional capacity assessment we made under paragraph (e) of this section, we will find that you are not disabled and will not make a finding about whether you can do your past relevant work at the fourth step.

20 C.F.R. § 404.1520(h).

Finally, at Step Five, the ALJ concluded that Plaintiff was not disabled because there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. R. 40. The ALJ relied upon Medical Vocational Rule 202.14, 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework. The ALJ reasoned as follows:

> In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).
>
> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.14. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of "not disabled" is therefore appropriate under the framework of this rule for the period from January 10, 2012 through October 22, 2012.

R. 40-41.

## IV.   ANALYSIS

The Court has labored over each of Plaintiff's several letters and submissions in order to identify and articulate the legal arguments upon which Plaintiff grounds his appeal. Although it is unclear from Plaintiff's submissions, the Court understands him to be challenging the ALJ's determination based upon alleged bias.  Plaintiff also appears to take issue with the determination of the ALJ and the vocational expert that jobs exist in the national economy that he can perform because he has been unable to secure a job over the past several years, despite his diligence in applying.  Pl. Mar. 3, 2017 Letter [Docket No. 32].  Finally, Plaintiff claims that he was injured in 2008, rather than on his alleged onset date of January 10, 2012, and appears to argue that, as a result, he is entitled to social security benefits prior to his alleged onset date.

### A. <u>Alleged Bias</u>

Individuals claiming disability benefits have a right to a full and fair hearing.  <u>Ventura v. Shalala</u>, 55 F.3d 900, 902 (3d Cir. 1995) (citing <u>Richardson</u>, 402 U.S. at 400-01). "Essential to a fair hearing is the right to an unbiased judge. The due process requirement of an impartial decisionmaker is applied more strictly in administrative proceedings than in court proceedings because of the absence of procedural safeguards normally available in judicial proceedings." <u>Id.</u>

(internal citations omitted) (citing Hummel v. Heckler, 736 F.2d 91, 93 (3d Cir. 1984)).  "The right to an unbiased ALJ is particularly important because of the active role played by ALJs in social security cases." Id.  A claimant's right to a full and fair hearing "is violated where a claimant is deprived of the opportunity to present evidence to an ALJ in support of his or her claim, or where the ALJ exhibits bias or animus against the claimant." Bordes v. Comm'r of Soc. Sec., 235 F. App'x 853, 857-58 (3d Cir. 2007) (citing Ventura, 55 F.3d at 902-03).

Plaintiff contends that his applications "were declined for **Bias reasons**."  Pl. Oct. 29, 2016 Letter [Docket No. 24] (emphasis in original).  Plaintiff does not specify the basis for his allegations of bias.  The Court has reviewed Plaintiff's correspondence with the Court and identified the following possible bases for Plaintiff's allegations of bias.

First, Plaintiff contends, in essence, that all ALJs are biased.  He states: "Even the SSD/SSA denial letter said this judge may have abused his power.  A survey and research says that only 2% to 3% of an (ALJ) judges [sic] will grant a case. Yes, they are **BIAS** and try to always deny cases for there [sic] organization."  Pl. Mar. 3, 2017 Letter [Docket No. 32] (emphasis in original).  Plaintiff, however, has pointed to no evidence in the record to support his claim of systemic bias, let alone of bias on the part of ALJ Wesner in particular.  See

Valenti v. Comm'r of Soc. Sec., 373 F. App'x 255, 258 (3d Cir. 2010) (rejecting claimant's argument that ALJ was biased in her case based upon examples of other cases in which courts held that the same ALJ erred in his analysis of the evidence); Santini v. Comm'r of Soc. Sec., 413 F. App'x 517, 520 (3d Cir. 2011) ("While we recognize that certain district courts in this Circuit have questioned [ALJ's] objectivity in other circumstances, [claimant] fails to point to any specific evidence of bias here.").

Additionally, Plaintiff contends that the ALJ "in my opinion was somewhat biased, rude, and [condescending]." Pl. Apr. 14, 2015 Letter [Docket No. 7]. He further claims that "[d]uring the questioning by the [ALJ] you will clearly hear in the transcript every time he ask[ed] me a question I was never allow[ed] enough time to fully give my comments or statement, he constantly and rudely interrupted me and would rush to another question and repeat the same tactics that was very annoying and unprofessional." Pl. Apr. 27, 2015 Letter [Docket No. 2]. Plaintiff also indicated that he was insulted by the ALJ's question as to whether Plaintiff and his friend Ilene, who accompanied Plaintiff to the hearing, lived together. Id. Finally, Plaintiff complains that the ALJ took personal calls from family members during the hearing and was "(undermining me)

rude, impolite, arrogant, interrupting me." Id.; Pl. Mar. 3, 2017 Letter [Docket No. 32].[1]

The Court has reviewed the transcript of Plaintiff's hearing before the ALJ. R. 49-101. Although the Court cannot assess the ALJ's demeanor or tone based upon the written transcript alone, the transcript suggests that, at times, the ALJ was frustrated and impatient with Plaintiff. This Court, however, finds no fault in the ALJ's conduct. Nothing in the record indicates that Plaintiff was deprived of the opportunity to present evidence to the ALJ or that the ALJ exhibited bias

---

[1] Plaintiff also complains of "all the 'subtle' collusion that was going on with there [sic] in-house office staff and protocols done against my constitutional rights." Mar. 3, 2017 Letter [Docket No. 32]. He further states:

> This was done in violation of my constitution rights [sic], when refusing to get zapped with cancer causing radiation. I was told to come back a second time by there [sic] doctor to get x-rays (slight threaten) or I would not receive my benefits, when in fact, That day of my appoiment [sic] I had present all of my updated MRI reports, film, cds, paper work, at which there [sic] state doctor (he) did NOT (refused) to look at then when I ask him to He side stepped that one. Even the radiologist said I was under no obligation to take them, but said, Quote: she could lose her job, if she did not do what she was told.

Id. There is nothing in the record before this Court that substantiates Plaintiff's claims of collusion or threats. Even if the state agency doctors acted improperly or unprofessionally towards Plaintiff, there is no evidence to suggest that the ALJ was biased by any such misconduct on the part of those doctors. Wanko v. Barnhart, 91 F. App'x 771, 774 (3d Cir. 2004).

against Plaintiff, such that Plaintiff was deprived of his right to a full and fair hearing.

For example, the hearing lasted over one hour and the ALJ permitted Plaintiff to speak at length about his alleged condition, his past work history, and his medical records. Plaintiff made clear that no other records exist other than those already in the ALJ's possession. The ALJ nevertheless expressed his commitment to further developing the factual record by obtaining additional medical records from Plaintiff's doctors, to the extent those records existed. Furthermore, the ALJ repeatedly explained the benefits of obtaining counsel to Plaintiff.

To the extent the ALJ was terse or frustrated with Plaintiff, however, such behavior did not evince such bias that would warrant a new hearing. See Fraser v. Astrue, 373 F. App'x 222, 225 (3d Cir. 2010) (rejecting argument that ALJ was biased because "[e]ven assuming, however, that the ALJ was rather brusque, there is no indication that there was any conflict of interest or inability to render a fair judgment."); Ventura, 55 F.3d at 903 (granting new hearing where "ALJ's questioning of the claimant was coercive and intimidating, and totally irrelevant to the question of whether claimant was disabled" and ALJ "continuous[ly] interfere[d] with the representative's introduction of evidence"). Indeed, the Supreme Court has held

18

that "not establishing bias or partiality, however, are
expressions of impatience, dissatisfaction, annoyance, and even
anger, that are within the bounds of what imperfect men and
women, even after being confirmed as federal judges, sometimes
display.  A judge's ordinary efforts at courtroom
administration--even a stern and short-tempered judge's ordinary
efforts at courtroom administration--remain immune."  Liteky v.
United States, 510 U.S. 540, 555-56 (1994).  Based upon the
record before it, the Court finds no evidence of bias, coercive,
or intimidating conduct on the part of the ALJ or that Plaintiff
was denied the opportunity to present evidence to the ALJ.[2]

## B. Vocational Expert Testimony

Next, Plaintiff appears to challenge the ALJ's reliance on
the vocational expert's testimony and, thus, the ALJ's

---

[2] The Court notes that Plaintiff believes that the ALJ
insulted his friend by asking whether she and Plaintiff lived
together.  The ALJ, however, did not press the issue or make any
commentary on this point that suggests bias, partiality, or
hostility.  Rimel v. Astrue, 521 F. App'x 57, 60 (3d Cir. 2013)
("Such questions, while of a very personal nature, do not
reflect any bias by the ALJ and did not impede the ALJ's
responsibility to help [Plaintiff] develop a full and fair
factual record.").  Likewise, Plaintiff's complaints that the
ALJ took personal calls from his wife and daughter during the
hearing do not establish that the ALJ was biased or interfered
with Plaintiff's ability to present evidence.  In fact, prior to
the second phone call, the ALJ apologized for the interruption
and, after the call concluded, the ALJ explained that he needed
to coordinate with his wife because his mother had just been
discharged from the hospital.  R. 96-97.  The ALJ then asked
Plaintiff: "Are you done?  I want to make sure you said
everything you wanted to say."  R. 97.

conclusion that there are jobs that exist in the national economy that Plaintiff can perform even with his limitations. At Step Five, the ALJ must evaluate the claimant's ability to adjust to other work through consideration of Plaintiff's RFC and "the vocational factors of age, education, and work experience." 20 C.F.R. § 416.960(c)(1). This other work must exist in significant numbers in the national economy. Id.; 20 C.F.R. § 416.966(a). In making this evaluation, the regulations permit the ALJ to rely upon the Medical-Vocational Guidelines, which "establish, for exertional impairments only, that jobs exist in the national economy that people with those impairments can perform." Schmidt v. Comm'r of Soc. Sec., 2013 WL 6188442, at *10 n. 2 (D.N.J. Nov. 25, 2013); 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(b). "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform." Sykes, 228 F.3d at 263. Here, as Plaintiff cannot perform the full range of light work, the ALJ properly obtained testimony from a vocational expert, Mr. Slaven. See 20 C.F.R. § 404.1566(e); Sykes, 228 F.3d at 273. Mr. Slaven testified that an individual who cannot reach overhead, with Plaintiff's age, education, and work experience, could perform a partial range of light work, including 300 to 400 of the titles recognized by the Social Security

Administration as light work titles, including bench work jobs.
R. 93.

Plaintiff attacks the ability of the Commissioner to rely upon such data concerning the numbers of available positions, in light of his own experience and difficulty in securing a job. Plaintiff argues that:

> They came up with theses [sic] fictitious and fatuous numbers about job avai[l]able and yet in a clasped [sic] economy, even if that were the case, do they think becoming avai[l]able to look for a light duty job that the doors will open wide with big arms, and say, sure, we have a job waiting just for you. No, that's because they've never been in the REAL work force today to see how tough it is not only to get a full time job (hired) but find an employer that will accept PT disability cases.
>
> . . .
>
> I would also challenge the [defendant] where did they get theses [sic] so called reports? What are the hiring ratios on those numbers geography? (USA) and can they find me a PT light duty job that will cover a sustainable income to support my monthly large expenses and debts ratios? I've been doing my due diligence for the past five years with-in [sic] my capabilities, and it's not out here. Besides, after an employer reviews my resume it's always the same thing. I get turned down for being <u>over qualified</u> or there not hiring part time disabled people. Does the defendant know I live in one of the highest repressed areas in the country right now? That are unemployed, or on SSD/SSI/assistance programs and (Food Stamps) (South Jersey).

Pl. Mar. 3, 2017 Letter [Docket No. 32].

While Plaintiff's predicament is unfortunate, the Court nonetheless rejects this argument outright as it is contrary to the regulations and case law, which have long recognized that an

ALJ may appropriately rely upon the testimony of a vocational expert while utilizing the Medical-Vocational Guidelines as a framework.  Santise v. Schweiker, 676 F.2d 925, 927-28 (3d Cir. 1982); see also SSR 83-12 ("The adjudicator will consider the extent of any erosion of the occupational base and access its significance. . . . Where the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource.").  Moreover, the regulations permit the use of "job information available from various governmental and other publications," including, for example, the Dictionary of Occupational Titles, published by the Department of Labor.  20 C.F.R. § 416.966(d); SSR 00-4p. However, contrary to Plaintiff's contention, whether Plaintiff can actually obtain a job is irrelevant for purposes of this analysis.  Rather, the relevant inquiry is whether jobs exist in the national economy that Plaintiff can perform "regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B) (emphasis added); 20 C.F.R. § 416.966(a) ("It does not matter whether--(1) Work exists in the immediate area in which you live; (2) A specific job vacancy exists for you; or (3) You would be hired if you applied for work.").

### C. Entitlement to Social Security Benefits Prior to Onset Date

The only issue before the ALJ was whether Plaintiff was disabled from his alleged onset date, January 10, 2012, through October 22, 2012, the day before he was found disabled by the Social Security Administration upon reconsideration.  Yet Plaintiff now appears to contend that he was originally injured in 2008 and that he is, therefore, entitled to benefits for at least two years prior to his alleged onset date.  Pl. Oct. 29, 2016 Letter [Docket No. 24].  Plaintiff writes: "In conclusion I would like to exercise my onset rule considering the pre application two year injurie[s] dates 2009 to 2012 for pain and suffering at your discretion."  Id.  Finally, Plaintiff seems to argue that he is entitled to disability benefits for two years prior to his application date because his "protective filing date" was in 2008.  Specifically, Plaintiff contends:

- Protective filing date pre injuries/disability 2008 then- 2010-2012 approved late 2012 (this was stated by SSD/SSA own admission.

- (A live call was placed by me to confirm this rule) Nine moths waiting time before approval.

- In almost every case where a claimant is awarded Social Security benefits based on disability, past due disability benefits, or disability "back pay" will also be received, back to when the disability application was filed, or sometimes even earlier.  The reason for this is plain: Social Security disability claims take a long time to process.  If the claims examiner or judge determines that the onset date is 17 months prior to the application date, or more, the

claimant <u>should be entitled to the entire 12 months
of retroactive benefits prior to the date of the
SSDI/SSD application.</u>

- An applicant may potentially receive benefits back to
the first of month after which he or she filed the
disability application.  <u>Alternatively, if you have a
"protective filing date" that's earlier than the date
you filed your disability application, you can get
disability benefits going back to that date as if it
were your application date.</u>

Pl. Mar. 3, 2017 Letter [Docket No. 32] (underlining and bullets
in original).

As a preliminary matter, the Court notes that Plaintiff's
unsupported statement that he was disabled as of 2008 is of no
moment.  Regardless of whether Plaintiff now claims he was
disabled as of 2008, Plaintiff protectively applied for DIB and
SSI on January 10, 2012, alleging an onset date of January 10,
2012.  R. 256-71, 279.

A claimant does not become eligible to receive SSI benefits
until the claimant has applied for SSI benefits and is found to
be disabled.  20 C.F.R. § 416.202.  Moreover, once a claimant
meets all other eligibility requirements for SSI, "the earliest
month for which [the Social Security Administration] can pay
[the claimant] benefits is the month following the month [the
claimant] filed the application."  20 C.F.R. § 416.335; <u>see also</u>
20 C.F.R. § 416.501.  Thus, a claimant cannot receive SSI
payments retroactively for time prior to his application for SSI
benefits regardless of when he is deemed disabled.  DIB, on the

other hand, may be paid retroactively, but only "for up to 12 months immediately before the month in which [the claimant's] application is filed."  20 C.F.R § 404.621(a)(1).

Critically, however, a claimant does not become eligible to receive either DIB or SSI until he becomes disabled.  See 42 U.S.C. § 423(a) ("Every individual who--", among other criteria, "is under a disability . . . shall be entitled to a disability insurance benefit . . . ."); 42 U.S.C. 1382(a) (defining "eligible individual" for SSI purposes as "each aged, blind, or disabled individual," who meets certain other criteria).  In other words, as a matter of law, Plaintiff was not eligible to receive DIB or SSI until he became disabled.  Accordingly, the Court must first consider whether the ALJ's determination that Plaintiff was not disabled from January 10, 2012 through October 22, 2012 is supported by substantial evidence.

Plaintiff's medical records are not particularly voluminous.  The records regarding Plaintiff's rotator cuff tear during the relevant period include documentation from Dr. Pepe, Dr. Lunt, consultative examiner Dr. Bagner, and state agency examiner Dr. Jacknin.  The record also includes the MRI reports by Dr. Cummings regarding Plaintiff's June 2010, July 2011, and April 2012 MRIs.  The ALJ addressed each of the medical records in his decision and noted the weight given to the various

25

medical opinions.[3]  The ALJ incorporated the medical opinions
into his findings as he deemed appropriate and developed
Plaintiff's RFC based upon the credible medical evidence and
Plaintiff's reports of his limitations and activities of daily
living.  R. 39.  Based upon the record, the Court finds that the
ALJ fulfilled his obligation to consider all pertinent medical
and non-medical evidence and "explain [any] conciliations and
rejections."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122
(3d Cir. 2000).

Moreover, as the Court explained in further detail above,
see supra Section IV.B., the ALJ's determination at Step Five of
the sequential analysis is also supported by substantial
evidence and should not be disturbed.  To carry his burden at
Step Five, the ALJ may utilize the Medical-Vocational Guidelines
set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.  As the
Third Circuit has explained, "[t]he grids [in the

---

[3] The ALJ did not specifically address the August 2011
Examination Report submitted by Mr. Colache, Plaintiff's
chiropractor.  The Court, however, sees no error in this
omission.  First, a chiropractor is not an "acceptable medical
source" for purposes of the ALJ's analysis.  Hartranft v. Apfel,
181 F.3d 358, 361 (3d Cir. 1999) (citing 20 C.F.R. § 416.913).
Additionally, the entire substance of Mr. Colache's report was
that Plaintiff had a "rotator cuff tear w/ shoulder instability
on right" as of 2008.  R. 373.  No treatment notes were provided
to the ALJ or this Court from Mr. Colache.  In fact, the record
indicates that Mr. Colache returned a request for medical
records on or about March 1, 2012 and explained that "I have not
treated [Plaintiff] in over a year sorry cannot fill out
paperwork."  R. 376.

Medical-Vocational Guidelines] consist of a matrix of four factors--physical ability, age, education, and work experience-- and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." Sykes, 228 F.3d at 263. "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform." Id. If, however, a claimant cannot perform substantially all of the exertional demands of work at a given level of exertion or has both exertional and non-exertional impairments, the ALJ may use the Medical-Vocational Guidelines as a framework, but must determine whether the additional limitations significantly erode the occupational base through, for example, the testimony of a vocational expert. See SSR 83-12; Sykes, 228 F.3d at 273.

Here, the vocational expert testified that there are jobs that exist in significant numbers in the national economy that someone with Plaintiff's age, education, and work experience, and who was limited to no overhead reaching could perform. R. 93. In his decision, the ALJ utilized the Medical-Vocational Guidelines as a framework for his disability determination and, in light of the vocational expert's testimony at the hearing, determined that Plaintiff was not disabled because there were jobs that existed in significant numbers in the national economy

that Plaintiff could perform despite his limitation to only occasional overhead reaching.[4]  The Court sees no reason to disturb this finding.  Accordingly, for the foregoing reasons, the Court finds that the ALJ's determination that Plaintiff was not disabled from January 10, 2012 through October 22, 2012 is supported by substantial evidence.

As a result of the ALJ's determination, Plaintiff did not become eligible for DIB or SSI until he was found to be disabled by the Social Security Administration on reconsideration as of October 23, 2012.  Plaintiff has not established that he should have been found disabled as of some date prior to October 23, 2012.  Therefore, contrary to Plaintiff's contentions, Plaintiff's eligibility for benefits began on October 23, 2012, the date he became disabled, and no earlier.  See, e.g., 20 C.F.R. § 416.202 ("You are eligible for SSI benefits if you

---

[4] The ALJ found that Plaintiff was not disabled at Step Five, reasoning that Plaintiff's limitation to only occasional overhead reaching had "little or no effect on the occupational base of unskilled light work."  R. 41.  The ALJ did not, however, specifically state in his opinion how he arrived at this conclusion.  To the extent this may constitute error, the Court finds it to be harmless error given the vocational expert's testimony that there are jobs that exist in significant numbers that someone with Plaintiff's profile could perform while completely avoiding overhead reaching.  Remand for the sole purpose of having the ALJ explicitly identify the vocational expert as support for this finding is unnecessary. See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (holding that "remand is not required [where] it would not affect the outcome of the case.").

meet <u>all</u> of the following requirements: . . . (a) You are --
(3) Disabled. . . . (g) You file an application for SSI
benefits."); 20 C.F.R. § 416.501 ("Payment of SSI benefits will
be made for the month after the month of initial eligibility and
for each subsequent month provided all requirements for
eligibility and payment are met.") (internal citations omitted);
20 C.F.R. § 404.315(a) ("You are entitled to disability benefits
. . . if . . . (2) You apply; (3) You have a disability, as
defined in §404.1505, or you are not disabled, but you had a
disability that ended within the 12-month period before the
month you applied . . . ."); 20 C.F.R. § 404.621(a)(1) ("If you
file an application for disability benefits . . . after the
first month you could have been entitled, you may receive
benefits for up to 12 months immediately before the month in
which your application was filed.").

    **V.   CONCLUSION**

    Accordingly, for the foregoing reasons, the Court affirms
the ALJ's determination that Plaintiff was not disabled during
the period January 10, 2012 through October 22, 2012. An
appropriate Order shall issue on this date.

s/Renée Marie Bumb<br>
RENÉE MARIE BUMB<br>
UNITED STATES DISTRICT JUDGE

Dated: <u>April 4, 2017</u>